JOURNAL ENTRY AND OPINION *Page 2 
{¶ 1} Appellant R.H. ("mother")[1] appeals from the decision of the trial court granting permanent custody of her daughter Y.H. to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). After a thorough review of the arguments and for the reasons set forth below, we affirm.
 {¶ 2} On October 1, 2004, CCDCFS filed a complaint alleging Y.H. to be a neglected and dependent child and requesting a disposition of temporary custody. Three days later, the trial court ordered pre-dispositional emergency custody of the child. Y.H. was adjudged dependent on February 2, 2005, and temporary custody was ordered on September 21, 2005. On November 22, 2005, CCDCFS filed a motion to modify temporary custody to permanent custody. Mother responded by filing a motion for legal custody, if not to herself, then to her sister and brother-in-law in West Virginia.
 {¶ 3} The trial court found, by clear and convincing evidence, that Y.H. could not be returned to mother's custody now or in the foreseeable future and that permanent custody was in the child's best interest.
 {¶ 4} The events that gave rise to the trial court's decision to grant permanent custody to CCDCFS began on September 14, 2004 when Y.H. was born. Hospital personnel contacted CCDCFS when mother was unable to recall where she lived. CCDCFS learned that mother had housing, but was unable to recall the information. *Page 3 
 {¶ 5} Two weeks later, Y.H. arrived at the hospital. Mother was unable to read the thermometer and was unaware that Y.H.'s temperature was 101 degrees. Y.H.'s maternal aunt had to instruct mother to call 911. During Y.H.'s hospitalization, it was revealed that mother was in a relationship with J. Harris, a registered sex offender, and that she had taken Y.H. with her when she visited Harris. The risks were explained to her, but rather than end the relationship, she left Y.H. with Harris' neighbor while she visited Harris. Mother did not know the neighbor's name, the address, or how long she had left the baby there.
 {¶ 6} On October 4, 2004, it was determined that emergency placement out of the family home was in the child's best interest and necessary to insure her safety and welfare.
 {¶ 7} Mother has mild-to-moderate mental retardation, with an I.Q. of 66. She has significant deficiencies in reading, writing, and performing basic computations. She has trouble counting change, reading time, estimating the passage of time, anticipating future dates and times, and difficulty with tasks requiring mathematic computation and logic.
 {¶ 8} Mother was adjudged incompetent in the Cuyahoga County Probate Court on February 9, 2005. The court's expert, Michael L. Miller, Ph.D. reported, that "[R.H.] has consistently tested and functions] in the mild range of mental retardation * * * lacks most independent living skills * * * [and] has not been employed since she graduated high school." Dr. Miller concluded: *Page 4 
 {¶ 9} "[R.H.] could not conduct business affairs without the aid of a guardian:
 {¶ 10} "[R.H.] can differentiate different bills, but cannot combine them, e.g., to make $26.00. She reported that she has been taken advantage of in stores due to her lack of money skills. She does not bank for herself. She agrees that she continues to need a payee;" and
 {¶ 11} "[R.H.] could not care for herself without the aid of a guardian:
 {¶ 12} "[R.H.] does not know what a guardian is. She did not appear to understand what this is, even when it was explained to her. She depends on others for advice, guidance, and direction."
 {¶ 13} As payee and guardian, Advocacy and Protective Services receives mother's disability income and applies it to her rent and other expenses.
 {¶ 14} CCDCFS developed a case plan that required mother to participate in services to assist her with parenting, money management, intellectual capacity, and physical health and environment. CCDCFS also referred her to a parenting program to aid parents with mental retardation. According to social worker Joseph Hengesbaugh, mother is cooperating with the money management and parenting aspects of her program. However, Mary Jo Neelon, a parenting mentor assigned to Y.H.'s case for the past two years, reports that mother is unable to apply the classroom lessons to real life situations.[2] *Page 5 
 {¶ 15} Since August 2005, mother has also been participating in Project Learn, which is an organization to help individuals improve their reading skills. She already has a high school diploma, and her reading skills have improved since enrolling in the program. She is always on time for class, always prepared for her assignments, and is not behind in any of her work.
 {¶ 16} Mother does not understand her child's development. Neelon testified that, although parenting instruction is broken down into small steps, mother has problems because she cannot retain the information. "Every class was like starting anew — back to some of the same information that may have been presented the week before." Mother visits with her child weekly; however, she relates to the child in an infantile manner, which is not age appropriate, and requires constant supervision with the child.
 {¶ 17} The person initially named by mother as a probable father of the child was excluded by genetic testing, and she later stated her pregnancy was the result of a sexual assault. Consequently, paternity has not been established. Maternal grandparents refused a background investigation, which is required of all prospective legal guardians. Maternal uncle Albert lives with mother and also receives disability income. Albert has no interest in caring for Y.H. The West Virginia Department of Health and Human Services disapproved mother's sister and brother-in-law as guardians for Y.H. Therefore, placing Y.H. with family is not an option. *Page 6 
 {¶ 18} According to Hengesbaugh, maternal uncle, maternal grandparents, and their significant others also live in the mother's home. The condition of the home includes a bad odor and dirty carpets. There are also household security issues. Doors are not locked, people frequently enter and exit the home, basement windows are broken, and there is no telephone.
 {¶ 19} At the time of the hearing, Y.H. had been in CCDCFS's custody for one year, ten months, and fifteen days (October 1, 2004 to August 15, 2006). Y.H. is now almost three years old, she is in a stable home, and has bonded with her foster family, who would like to adopt her.
 {¶ 20} Mother brings this appeal asserting one assignment of error:
 {¶ 21} "I. The trial court erred by awarding permanent custody of Y.H. to the Cuyahoga County Department of Children Services when it was not in the child's best interest."
 {¶ 22} The standard of proof to be used by the trial court when conducting permanent custody proceedings is that of clear and convincing evidence. R.C. 2151.414(B)(1).
 {¶ 23} "Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a *Page 7 
reasonable doubt as in criminal cases. It does not mean clear and unequivocal." Cross v. Ledford (1954), 161 Ohio St. 469, 477,120 N.E.2d 118, 123.
 {¶ 24} It is well established that when some competent, credible evidence exists to support the judgement rendered by the trial court, an appellate court may not overturn that decision unless it is against the manifest weight of the evidence. Seasons Coal Co., Inc. v.Cleveland (1984), 10 Ohio St.3d 77, 80; C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, 280.
 {¶ 25} The discretion that a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. In re Satterwhite, Cuyahoga App. No. 77071, 2001-Ohio-4137. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding (i.e., observing their demeanor, gestures and voice inflections, and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. Id., citing Trickey v. Trickey (1952), 158 Ohio St. 9, 13. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct.Seasons Coal Co., Inc., supra at 80. As the Supreme Court of Ohio has stated, "it is for the trial court to resolve disputes of fact and weigh the testimony and credibility of the witnesses." Bechtol v. Bechtol
(1990), 49 Ohio St.3d 21. *Page 8 
 {¶ 26} The standard of review for such matters is to determine whether the trial court abused its discretion in reaching its judgment. Absent a clear abuse of that discretion, the lower court's decision should not be reversed. Mobberly v. Hendricks (1994), 98 Ohio App.3d 839, 845,649 N.E.2d 1247.
 {¶ 27} The Ohio Supreme Court has explained as follows:
 {¶ 28} `"An abuse of discretion involves far more than a difference in opinion. The term discretion itself involves the idea of choice, of an exercise of will, of a determination, made between competing considerations. In order to have an `abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance thereof, not the exercise of reason but rather of passion or bias.'" Id. at 845-846, quoting Huffman v. Hair Surgeons, Inc. (1985),19 Ohio St.3d 83, 87.
 {¶ 29} To constitute an abuse of discretion, the ruling must be more than legal error; it must be unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 50 OBR 481,450 N.E.2d 1140.
 {¶ 30} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. In re Murray (1990),52 Ohio St.3d 155, 156, 556 N.E.2d 1169, 1171. A parent's right is not absolute however. The natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling *Page 9 
principle to be observed." In re Cunningham (1979), 59 Ohio St.2d 100,106, 391 N.E.2d 1034, 1038. Consequently, the state may terminate parental rights when the child's best interest demands it.
 {¶ 31} We would like to note that it was extremely difficult for this court to come to a decision in this case. The record indicates that mother, to the best of her ability, has completed all of the requirements of the case plan. It is clear that mother loves her child very much. Unfortunately, "completion of a case plan does not, in and of itself, require that children be reunified with parents * * *." In reJ.L., Cuyahoga App. No. 84368, 2004-Ohio-6024. Ultimately, the child's best interest must prevail.
 Statutory Requirements for Permanent Custody {¶ 32} The trial court must satisfy two requirements before ordering that a child be placed in the permanent custody of a children's services agency. First, the court must find that one of the four conditions under R.C. 2151.414(B)(1) exists by clear and convincing evidence:
 {¶ 33} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 34} "(b) The child is abandoned. *Page 10 
 {¶ 35} "(c) The child is orphaned * * *.
 {¶ 36} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 37} If the trial court determines that one of these conditions is met, it then must determine by clear and convincing evidence that permanent custody is in the best interest of the child by considering all relevant factors, including those listed in R.C. 2151.414(D).
 {¶ 38} On August 15, 2006, the trial court determined that R.C.2151.414(B)(1)(d) was applicable:
 {¶ 39} "The court finds that the child has been in the temporary custody of the Cuyahoga County Department of Children and Family Services for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 40} The court also made findings under R.C. 2151.414(E), which support a further determination that the child "cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(a). See In reK, Cuyahoga App. No. 83410, 2004-Ohio-4629.
 {¶ 41} R.C. 2151.414(E) provides: *Page 11 
 {¶ 42} "In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."
 {¶ 43} The trial court made the following findings with respect to R.C. 2151.414(E):
 {¶ 44} "Following the placement of the child outside the home, and notwithstanding reasonable case planning and diligent efforts by CCDCFS to assist the [mother] to remedy the conditions that initially caused the child to be placed outside the home, the [mother has] failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home and that the [mother has] failed to substantially benefit from services, and therefore [has] not reduced the risk. The court has considered parental utilization of rehabilitative services that were made available to the [mother] for the purpose of changing parental conduct to allow [her] to resume and maintain parental duties." [R.C 2151.414(E)(1)].
 {¶ 45} Having determined by clear and convincing evidence that the child had been in the custody of CCDCFS for twelve or more months of a consecutive twenty-two month period and that one or more of the sixteen factors under R.C. *Page 12 2151.414(E) existed as to the child's parent, the first requirement for permanent custody was satisfied.
 Best Interest of the Child {¶ 46} Appellant's assignment of error involves a best interest requirement under R.C. 2151.414(B). In determining the best interest of a child, a trial court is to consider "all relevant factors" including, but not limited to, the five under R.C. 2151.414(D):
 {¶ 47} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 48} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 49} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 50} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 51} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." *Page 13 
 {¶ 52} The trial court is only required to consider these factors, and only one factor needs to be resolved in favor of permanent custody.In re Shaeffer Children (1993), 85 Ohio App.3d 683.
 {¶ 53} R.C. 2151.414(C) prohibits consideration of the effect that granting permanent custody would have upon the parent. The goal in determining custody of a child is deciding what is in the best interest of the child. In re Baby Girl Baxter (1985), 17 Ohio St.3d 229. This must be the primary concern in any child custody case. In re Higby
(1992), 81 Ohio App.3d 466. Failure to use a best interest standard constitutes an abuse of discretion. In re Adoption of Ridenour (1991),61 Ohio St.3d 319.
 Child's Interaction With Others R.C. 2151.414(D)(1) {¶ 54} Y.H. enjoys mother's company, but also enjoys her foster mother's company and refers to her as "mommy." Mother does not interact with Y.H. in an age-appropriate manner and cannot tell when Y.H. is hungry or sick. She cannot estimate the correct amount or size of food to feed her. Mother does not understand child development and underestimates Y.H.'s abilities. Mother needs constant supervision while caring for Y.H. According to Neelon, "[R.H.] would have a great deal of difficulty without twenty-four hour supervision * * *."
 {¶ 55} The maternal grandparents will not cooperate with the background checks required to determine if they are appropriate guardians for Y.H. Mother's brother (who also has mental disabilities) does not want to care for her. Mother's *Page 14 
sister Maddie and brother-in-law Jimmy Butterworth (residing in West Virginia) were not approved as a placement due to mental health and anger management issues.
 {¶ 56} Currently, Y.H. is in a stable, loving home with foster parents with whom she has bonded. The foster parents would even like to adopt Y.H. The trial court had sufficient evidence concerning Y.H.'s interaction with the individuals in her life to support its determination that permanent custody was in her best interest.
 The Wishes of the Child R.C. 2151.414(D)(2) {¶ 57} Y.H. was one year, eleven months, and two days old at the time of the hearing in this case, and too young to express her wishes. Guardian ad litem Stephen DeJohn noted that mother wants her child and abided by the visitation schedule, but that she is limited in her capacity, so it is irresponsible to place the child with her. DeJohn reported that Y.H. has been with her foster parents, with whom she has bonded, for most of her life. As a result of his findings, DeJohn recommended permanent custody. According to DeJohn:
 {¶ 58} "[C]hild has motor and developmental delays. Mom is mentally retarded and doesn't read very well; she has little concept of time. Mom also has a hearing deficit. All of this is particularly significant for times when the child is sick and requires periodic administration of medication. A parenting mentor has been working with her for about a year, but doesn't feel confident that mom retains the concepts given in class and, therefore, is not competent in the necessary skills to *Page 15 
keep the child healthy and safe. In addition, mom has a legal guardian who handles her legal matters because of her mental incompetence to do so herself."
 Custodial History of the Child R.C. 2151.414(D)(3) {¶ 59} Y.H. was born on September 14, 2004. On October 1, 2004, she was placed in the emergency custody of CCDCFS. The trial court found her to be dependent and placed her in the temporary custody of CCDCFS on September 21, 2005. CCDCFS filed a motion for permanent custody on November 22, 2005 after Y.H. had been in CCDCFS's custody for one year, one month, and twenty-two days. On August 15, 2006, the trial court granted permanent custody.
 Need for a Legally Secure Permanent Placement R.C. 2151.414(D)(4) {¶ 60} The record and the Guardian ad litem's report support a finding that mother's mental retardation is so severe that it makes her unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the hearing, under R.C.2151.414(E)(2). Accordingly, the trial court was required to find that Y.H. could not be placed with mother. The maternal grandparents refused a background check, and the maternal uncle is not interested in caring for Y.H. Neither the grandparents nor the uncle filed motions for legal custody. The West Virginia Department of Health and Human Resources disapproved of Maddie and Jimmy Butterworth. *Page 16 
 {¶ 61} Accordingly, the trial court properly concluded that a legally secure placement could not be achieved for Y.H. without a grant of permanent custody.
 {¶ 62} In addition, R.C. 2151.414(D)(5) requires the court to consider factors under R.C. 2151.414(E)(7) through R.C. 2151.414(E)(11). None of those factors are relevant here.
 {¶ 63} The second statutory requirement for permanent custody was satisfied by the introduction of sufficient evidence to enable the court to determine the child's best interest.
 Conclusion {¶ 64} Mother has clearly put forth a tremendous effort to cooperate with CCDCFS's attempt at reunification. She has gone to all required parenting classes, visits with her child, and continues to improve her reading skills. Despite these efforts, the trial court concluded, based on clear and convincing evidence, that the best interest of the child would be best served by placing her in a safe, stable home. Although this was an extremely difficult decision, we ultimately find that the trial court did not abuse its discretion in awarding permanent custody to CCDCFS. Permanent custody is in the best interest of the child.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
 The court finds there were reasonable grounds for this appeal. *Page 17 
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., ADMINISTRATIVE JUDGE
ANTHONY O. CALABRESE, JR., J., CONCURS;
MARY EILEEN KILBANE, J., [DISSENTS WITH SEPARATE OPINION]
[1] The parties are referred to herein by their initials or title in accordance with this court's established policy regarding non-disclosure of identities in juvenile cases.
[2] E.g., she may understand that a grape must be cut in half to be eaten by a child, but she cannot apply this same understanding to similar foods, such as a cherry.